**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **MARK P. LEWIS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 13 CV 5748** |
| **v.** | ) | |
| | ) | **Magistrate Judge Michael T. Mason** |
| **CAROLYN W. COLVIN, Acting** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION AND ORDER**

Michael T. Mason, United States Magistrate Judge:

Claimant Mark P. Lewis ("Lewis" or "Claimant") brings this motion for summary judgment [14] seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner"). The Commissioner denied Lewis' claim for disability insurance benefits under the Social Security Act (the "Act"), 42 U.S.C. §§ 416 and 423. The Commissioner has filed a cross-motion [25], asking that this Court uphold her previous decision. This Court has jurisdiction to hear this matter pursuant to 42 U.S.C. § 405(g). For the reasons set forth below, Claimant's motion for summary judgment is granted and the Commissioner's cross-motion is denied.

**I.      BACKGROUND**

**A.      Procedural History**

Lewis filed his first claim for benefits in 2005. (R. 287). That claim was denied on June 26, 2007, and Lewis did not appeal that denial. (*Id.*) Lewis filed his second application (hereinafter, "the prior claim") on October 30, 2008, alleging an onset of

disability of June 27, 2007 (the day after the denial of his first application).  (*Id.*)  That claim was denied initially on January 8, 2009.  (*Id.*)  A hearing was held before an Administrative Law Judge ("ALJ") on February 16, 2010.  (R. 287-88.)  The ALJ denied Lewis' prior claim on May 26, 2010.  (R. 288.)  Lewis filed a request for review with the Appeals Council, but withdrew that request before a decision was rendered.  (R. 288.)

On July 27, 2010, Lewis filed his third application for benefits (and the topic of the instant claim), again alleging an onset of disability of June 27, 2007.  (R. 180-86.)  His date last insured was December 31, 2011.  (R. 33.)  His claim was denied initially on October 18, 2010.  (R. 108-09, 112-16.)  Lewis then filed a timely request for a hearing. (R. 119.)  Prior to the hearing before ALJ Michael Hellman, Claimant's counsel submitted a pre-hearing brief, asking that ALJ Hellman reopen Claimant's prior claim in accordance with 20 C.F.R. §§ 404.988 and 404.989 because new and material evidence was presented that was not available to the ALJ in the prior claim.  (R. 287-92.)

On February 22, 2012, Lewis appeared with counsel before ALJ Hellman.  (R. 48-101.)  On March 9, 2012, ALJ Hellman issued a written decision, in which he declined to reopen Lewis' prior claim, and denied Lewis' pending (and third) application for benefits.  (R. 29-47.)  Lewis filed a timely request for review with the Appeals Council.  (R. 28.)  On April 29, 2013, the Appeals Council denied that request, making the ALJ's decision the final decision of the Commissioner.  (R. 1-6); *Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013.)  This action followed, and the parties consented to the jurisdiction of this Court.

**B.    Medical Evidence**

Claimant seeks benefits for disabling conditions stemming from lumbar disc disease, status post lumbar spine surgeries, osteoarthritis, cervical disc disease with stenosis and radiculopathy, high triglycerides, diabetes mellitus, hypertension, major depressive disorder, bipolar disorder, and alcohol dependence, in remission.

### 1.    Treating Physicians for Physical Ailments[1]

Records reveal that Lewis had a knee replacement in 2000.  (R. 757.)  In November of 2005, after suffering an injury at work as a truck driver, and failed conservative treatment, Lewis underwent his first back surgery, which consisted of a two-level fusion and bone graft by Dr. Patrick Sweeney and Dr. Augusto Chavez.  (R. 957-58, 984-88.)  Lewis attempted physical therapy and a work-conditioning program, but remained off work for at least the entire year post surgery.  (R. 872-84, 824, 897-907.)  He continued to complain of debilitating back pain even a year post surgery. (*See e.g.*, R. 757.)

In November of 2006, Dr. Keith Wilkey reviewed all of Lewis' records.  (R. 915-16.)  Dr. Wilkey opined there was a non-union in Lewis' bone graft, residual spinal stenosis at L3-4, and probably right L4 remaining stenosis.  (R. 915.)  He recommended additional surgery.  (*Id.*)

At Dr. Wilkey's referral, Lewis saw Dr. Nolden for consultation.  (R. 521-27.) Lewis told Dr. Nolden that following his initial surgery, he experienced little pain relief.

---

[1] Though the ALJ adjudicated Lewis' disability from May 27, 2010 through the date last insured, for the sake of completion, we have included a full recitation of the medical history in the record.

(R. 521.)  Over the past year he had been noticing "progressively worsening and, at times, disabling low back pain with radiation into the bilateral thighs, especially with standing and walking." (*Id.*)  After reviewing preoperative imaging, Dr. Nolden noted a possible pseudarthrosis at L4-L5 and L5-S1.  (R. 522.)  There was no pedicle screw instrumentation loosening.  (*Id.*)  Dr. Nolden also opined that adjacent segment degeneration at L3-L4 resulted in moderately severe spinal stenosis at that level.  (*Id.*)  After physical therapy and injections proved unsuccessful, Dr. Nolden recommended additional surgery, and he performed a four-level fusion on April 10, 2007.  (R. 521-26.)

At a routine post-operative follow-up with Dr. Nolden on January 2, 2008, Lewis reported that he was doing well, and had only mild low back pain at the lumbosacral junction.  (R. 532.)  He denied any lower extremity pain or neurological symptoms.  (*Id.*) The record reveals that Lewis had been participating in physical therapy two times per week for eight weeks.  (*Id.*)  Dr. Nolden noted Lewis was doing well from a post-operative standpoint, and recommended he begin a work-conditioning program.  (*Id.*) He opined that Lewis would have permanent activity restrictions, likely a lifting restriction of no greater than forty five to fifty pounds on occasion.  (*Id.*)

About a year post surgery, on April 2, 2008, Lewis returned to see Dr. Nolden and reported that he was "80 percent or greater improved compared to his pre-operative back and leg pain." (R. 529.)  He reported some low level back pain with increasing physical activity, which was expected by Dr. Nolden.  (*Id.*)  Dr. Nolden noted that Lewis' physical therapy and work conditioning program had been placed on hold due to his hypertension, which was now under control.  (R. 529, 542, 545.)  Dr. Nolden also

reviewed new AP, lateral, and oblique views of the lumbosacral spine. (R. 529.) The images revealed "complete posterolateral fusion from L3 to S1 with no change in spinal implant positioning and excellent lumbosacral alignment," and a wide decompression from L3 to S1. (*Id.*) Dr. Nolden opined that an eighty percent improvement in back and leg pain was the best Lewis could hope for. (*Id.*) Dr. Nolden recommended that Lewis undergo a Functional Capacity Evaluation ("FCE") to determine what his activity tolerance would be for future employment. (*Id.*)

On April 7, 2008, Lewis underwent the FCE as recommended by Dr. Nolden. (R. 535-41.) Dr. Nolden reviewed the FCE on April 23, 2008. (R. 528.) According to the results of the FCE, Lewis was able to perform "functional capabilities at the light physical demand level," which means "he is capable of occasionally lifting up to 28 pounds off of the ground and 25 pounds up to shoulder level." (R. 535.) His sitting tolerance was approximately thirty minutes at a time, and his prolonged standing tolerance was around fifteen minutes. (R. 539.) Lewis did make multiple reports of lumbar pain during the FCE. (R. 535.) Dr. Nolden provided Lewis with a work release form that stated he was able to perform work at an intermediate/light capacity, lifting five to ten pounds frequently, and up to thirty pounds occasionally at a height between the waist and shoulders. (R. 528.) In Dr. Nolden's opinion, these restrictions were permanent based on Lewis' operative, low back history. (*Id.*)

On July 16, 2009, Lewis returned to see Dr. Wilkey. (R. 563.) Lewis said he was doing well following his second surgery, until a few months prior when he developed lower back pain, aggravated by walking and standing. (*Id.*) He was walking less than

one hour per day.  (*Id.*)  At the time, he was taking Oxycontin, Cymbalta, and Soma.  (*Id.*)  A physical examination revealed tenderness to palpitation in the left buttocks and lower central lumbar area.  (*Id.*)  Range of motion of the lumbar spine was limited in all planes.  (*Id.*)  Dr. Wilkey reviewed recent imaging that showed an excellent fusion and no evidence of hardware loosening.  (R. 564.)  He assessed osteoarthirtis and recommended that Lewis be kept on anti-inflammatory medication.  (*Id.*)

Lewis returned to see Dr. Wilkey on July 30, 2009, complaining of leg radiculopathy and asking Dr. Wilkey to complete disability forms.  (R. 564.)  An examination showed soreness over the right hip, limited range of motion of the spine, and difficulty getting up from the chair.  (*Id.*)  Dr. Wilkey gave Lewis a cortisone shot in his right hip and ordered an MRI.  (*Id.*)

Dr. Wilkey also completed a medical source statement for Lewis' prior disability claim.  (R. 646-47.)  According to Dr. Wilkey, Lewis could frequently lift eleven to twenty-five pounds, occasionally twenty-six to fifty; could walk for a total of two hours in an eight hour work day; and sit a total of four hours.  (R. 646.)  He concluded that Lewis would need to assume a reclining position for thirty minutes twice a day and assume a supine position for thirty minutes twice a day.  (*Id.*)  Further, he determined that Lewis could never climb, or be exposed to heights, and that he could occasionally balance, bend, stoop, kneel, crouch, and occasionally be exposed to machinery and vibration.  (R. 647.)

A month later, Dr. Wilkey reviewed the MRI he ordered, which showed mild disc bulging and stenosis at L1-2 and L2-3.  (R. 564-65.)  Decompression was excellent at

other levels and the fusion was in good shape.  (R. 565.)  Lewis again showed difficulty

getting out of his chair, and a limited range of motion of the spine.  (*Id.*)  Dr. Wilkey

determined that Lewis did not need additional surgery and was at maximum medical

improvement.  (*Id.*)  Dr. Wilkey recommended permanent restrictions in bending,

twisting, sitting and standing, and that lifting and carrying be limited to twenty pounds.

(*Id.*)  He ordered physical therapy to help strengthen the spine.  (*Id.*)

Lewis saw Dr. Wilkey's nurse practitioner on November 24, 2009, at which time

he complained of neck pain and migraines.  (R. 565.)  He had been undergoing

injections, but rated his neck pain a four out of ten and his migraines a ten out of ten.

(R. 565.)  He exhibited good range of motion of the cervical spine, but pain exacerbated

with flexion and extension.  (R. 566.)  The nurse recommended that Lewis be evaluated

by a headache specialist.  (*Id.*)

On January 5, 2010, Lewis saw Dr. Wilkey again, complaining mainly of

headaches.  (R. 548.)  He had been seen in the headache center with a negative work-

up.  (*Id.*)  Examination showed normal cervical lordosis; range of motion of the neck was

full, but guarded.  (*Id.*)  Dr. Wilkey reviewed an MRI that showed significant disc

herniations at C5-C6 and C6-7 abutting the spinal cord.  (*Id.*)  Spinal stenosis was also

observed at those levels.  (*Id.*)  Dr. Wilkey recommended pain injections in his neck.

(*Id.*)  He also opined that due to Lewis' history of surgeries to the lumbar spine, Lewis'

permanent restrictions would include "standing no more than ½ hour, sitting no more

than 1 hour, with change in position as needed for either."  (*Id.*)

On January 6, 2010, Lewis saw Dr. Stephen Schmidt at Pain Management Services for continued complaints of back and neck pain. (R. 499.) The records from that visit reveal that Lewis saw Dr. Schmidt the week prior and underwent an epidural steroid injection. (*Id.*) Lewis reported thirty percent relief from his low back pain following the injection. (*Id.*) Dr. Schmidt acknowledged that he had attempted to treat the neck pain in the past without much success. (*Id.*) He assessed cervical disc herniation and administered a left C6 and C7 epidural injection. (R. 500-02.) He started Lewis on Oxycontin. (R. 500.)

On January 11, 2010, Lewis was treated at Des Peres Internal Medicine South ("Des Peres") after complaining of breathing problems over the previous few days. (R. 362-75.) He also complained of rib pain. (R. 374.) Physical examinations revealed post-nasal drip, wheezing, and a red and bulging tympanic membrane. (R. 366, 374.) The examining physician assessed diabetes, hypertension (controlled), hyperlipidemia (with cholesterol not at goal levels), back pain (uncontrolled), headaches (uncontrolled), asthma (uncontrolled) and insomnia. (*Id.*) He also assessed pleurisy and mastoiditis. (R. 374.) Lewis did not show symptoms consistent with depression. (*Id.*) Lewis was started on antibiotics for the pleurisy and mastoiditis. (R. 374.) He was advised to exercise and improve his diet, and to avoid stress, cigarette smoke and caffeine. (*Id.*) As for Lewis' back pain, the examining doctor changed his medication regime, but opined that if improvement was not seen with these conservative measures, he would refer Lewis for additional imaging and/or physical therapy. (*Id.*) If those options failed, he planned to refer Lewis to a spinal surgeon for evaluation. (*Id.*)

On January 26, 2010, Lewis returned to Des Peres for evaluation after imaging showed a mass in the left lower lobe of his left lung.  (R. 378-80.)  Lewis did report improvement in lung pain since he was last seen.  (R. 378.)  An examination showed some pain on palpation of the left lower rib cage and it was recommended that he obtain a biopsy on the lung mass and see a cardiothoracic surgeon.  (R. 379-80.)

By February 1, 2010, Lewis was "doing well," though he complained that he suffered from chills and sweating associated with low blood sugar the past few weeks.  (R. 382.)  He also reported numbness and tingling in his fourth and fifth digits on both hands.  (R. 384.)  He did follow up with a cardiothoracic surgeon and was thought to have a healing infection.  (R. 382.)  Lewis denied any symptoms of depression and denied any problems with: sleep, interest, guilt, energy, concentration, appetite, psychomotor retardation, or suicidal thoughts.  (*Id*.)  He was tolerating his medications well.  (*Id*.)  He was exercising, and trying to avoid fatty foods and cigarettes.  (*Id*.)  A physical exam was normal.  (R.  384-85.)  The doctor opined that the finger numbness may be related to blood sugar.  (R. 386.)  He encouraged Lewis to continue his diet and exercise, and advised him to report any problems with depression.  (*Id*.)

Lewis returned for follow-up with Dr. Schmidt on February 10, 2010.  (R. 448-51.)  He again reported partial, but temporary relief from the previous steroid injections.  (R. 448.)  The Oxycontin helped to improve his pain significantly.  (*Id*.)  In any event, Lewis still reported that his pain was "worse", and described it as aching, sharp, and variable.  (*Id*.)  Upon examination, Dr. Schmidt observed that Lewis had a forward flexed gait and stance.  (R. 449.)  He had increased pain with extension of the spine, but improvement

of pain with flexion of the spine.  (*Id.*)  Dr. Schmidt also noted tenderness on palpation overlying the lumbar facet joints in the midline.  (*Id.*)  His range of motion was otherwise normal throughout.  (*Id.*)  Lewis displayed appropriate judgment and memory ability and a normal affect.  (*Id.*)  Dr. Schmidt assessed post-laminectomy syndrome in the lumbar region.  (R. 450.)  Lewis underwent right and left epidural steroid injections for pain relief.  (R. 451.)  Dr. Schmidt also increased Lewis' dosage of Oxycontin and advised him to return in one month for reevaluation.  (R. 450.)

Records reveal that Lewis was treated at Ryan Headache Center on February 11, 2010 for his complaints of daily headaches, which he described as moderate in intensity.  (R. 352-60.)  At that time, Lewis had not quit smoking, was not using his Continuous Positive Airway Pressure machine ("CPAP"), was not checking his blood sugar on a daily basis, and was still obese.  (R. 353.)  Lewis' diet was "horrible and he drinks 24 ounces of caffeine per day."  (*Id.*)  He had been taking Oxycontin, Depakote, and Orphenadrine, without side effects, among a bevy of other medications.  (R. 353-354.)  His past medical history listed problems associated with ADHD, depression, headaches, back pain, GERD, history of alcoholism, obstructive sleep apnea, diabetes, hypertension, and hyperlipidemia.  (R. 355.)

A physical exam revealed normal results.  (R. 356.)  The physician advised Lewis to maintain a healthy diet, exercise regularly, practice relaxation and stress management techniques, avoid identifiable headache risks factors, use his CPAP, check his blood sugar, and to quit smoking.  (R. 356.)  He was prescribed Tizanidine

and was instructed to continue taking Orphenadrine, Depakote, and all other medications prescribed by his other physicians.  (R. 357.)

Lewis returned to Des Peres on February 23, 2010, and reported that he felt "terrible."  (R. 397.)  He was trying to "eat right and do everything right," but was feeling depressed and anxious.  (*Id.*)  He also reported nausea, constipation, and fatigue.  (R. 398.)  A physical examination was normal.  (R. 399.)  His blood pressure, GERD, and diabetes were noted as being under control.  (R. 397.)  After reviewing all current medications, his doctor recommended that Lewis discontinue his use of Oxycontin in an effort to alleviate his nausea and constipation.  (R. 399.)

He returned to Des Peres on March 2, 2010, at which time he complained of swelling of his hands and feet.  (R. 406.)  He also reported that he had been doing "physical therapy forever," with some progress.  (*Id.*)  Lewis complained of arthritis in the back, knees, and hand, as well as chronic pain.  (R. 407.)  A physical exam revealed mild swelling of the hands and feet.  (R. 408.)  The examining doctor assessed uncontrolled arthritis, among other things.  (*Id.*)  He reviewed treatment options with Lewis, including escalation of nonsteroidal anti-inflammatory drug therapy and joint injections, and recommended, if no improvement, a referral to physical therapy, rheumatology, or possibly orthopedic surgery.  (*Id.*)

Lewis was seen on April 26, 2010 by Dr. Williams, a spine specialist, for a consultation regarding his chronic lower back pain.  (R. 429-35.)  Lewis presented with "severe low back pain and left hip pain, numbness in hands and feet."  (R. 429.)  He reported his back problems started in late 2004 when he was working as a truck driver.

(*Id.*)  He described his history of treatment and fusion surgeries.  (*Id.*)  Though he was feeling "85% better" in 2008, by June of 2009, he noticed increasing requirements for pain medication without any specific trauma or inciting incident.  (*Id.*)  Lewis described his pain at the lumbosacral junction on both sides and in the left superior gluteal region and the upper lumbar spine in the midline.  (R. 429.)  He described it as a "burning, constant aching, and sharp pain."  (*Id.*)  He rated his pain as an eight out of ten at worst, and four out of ten at best.  (*Id.*)  His pain was worse when standing, sitting, and walking, but improved upon lying down, leaning on a counter, table, or shopping cart. (*Id.*)  Lewis also complained of numbness in both hands and both feet, which he claimed started within the last couple months.  (*Id.*)  Upon review of systems, Lewis complained of chills, fatigue, muscle and joint pain, memory loss, anxiety, depression, stress, difficulty concentrating, and sleep disturbance.  (R. 429-30.)  He stated that he could not bathe, dress, or get up from a chair or bed.  (R. 430.)

A physical examination revealed some tenderness in the lower lumbar and right gluteal regions, but otherwise normal station and gait and normal range of motion throughout.  (R. 431.)  He was alert, and exhibited an appropriate affect and demeanor. (*Id.*)  Dr. Williams reviewed lumbar spine imaging dated August 3, 2009, which showed anterior and posterior instrumented fusion from L3 through S1 with hardware in place, and disc height well preserved throughout.  (*Id.*)

Ultimately, Dr. Williams assessed chronic low back pain in the setting of the lower lumbar fusion.  (R. 431.)  He noted that Lewis' history and physical examination did not suggest radiculopathy, cauda equina injury, or other similar pathology.  (*Id.*)

Rather, Dr. Williams indicated that deconditioning and psychological factors were likely significant problems for Lewis. (*Id.*) He recommended Lewis discontinue Oxycontin and initiate physical therapy. (R. 431-32.)

Lewis returned for a follow-up with Dr. Williams on May 19, 2010, after completing approximately seven physical therapy sessions. (R. 433.) The therapeutic exercise, as well as some muscle energy and joint manipulation techniques involving his hip, had helped him relatively consistently. (*Id.*) Overall, he felt ten to fifteen percent better. (*Id.*) He wanted to continue therapy, but was concerned about the cost. (*Id.*) Lewis also reported that he had been trying to decrease his dosage of Oxycontin and had only been taking it two to three times a week. (R. 435.)

On July 8, 2010, Lewis returned to see Dr. Wilkey, complaining of neck pain and occasional numbness in both extremities. (R. 462.) A physical examination revealed, among other things, limited range of motion to the neck, particularly with right rotation and lateral bending to the right. (*Id.*) Dr. Wilkey assessed cervical spondylosis and right arm radiculopathy and ordered EMG and nerve conduction studies. (*Id.*)

When Lewis returned on July 20, 2010, he told Dr. Wilkey's nurse practitioner that he was unable to complete the EMG and nerve conduction studies because he was not able to tolerate the procedure. (R. 462.) Lewis also complained of a new symptom of left arm radiculopathy. (*Id.*) On physical exam, Lewis exhibited a 4/5 weakness to the right thumb extensor; otherwise, the exam was unremarkable. (*Id.*) The nurse reviewed a previous MRI from November 2009 that showed degenerative changes at C5-6 and C6-7, and what appeared to be a right foraminal disc protrusion at C5-6 and a

left foraminal disc protrusion at C6-7. (*Id.*) The nurse assessed left arm radiculopathy, possible bilateral carpal tunnel syndrome, and right thumb extensor weakness. (*Id.*) According to the nurse, Lewis' symptoms could be caused by a herniated disc. (R. 463.) She ordered further imaging of the cervical spine and referred Lewis for a cervical steroid epidural injection. (*Id.*) The MRI of the cervical spine was limited due to patient movement. (R. 464-65.) It did, however, reveal bulging discs at C5-6 and C6-7 with evidence of foraminal stenosis. (R. 463-65.)

Lewis returned to see Dr. Schmidt on July 21, 2010, at which time he complained of numbness and tingling in his hands and forearms. (R. 452.) Lewis explained that he recently underwent unsuccessful nerve conduction study and MRI. (*Id.*) But he also explained that he had an MRI in November of 2009 that showed various abnormalities, including spinal stenosis at C3-C4, as well as C6-C7 abnormalities, and facet arthropathy throughout. (*Id.*)

During Lewis' physical exam, Dr. Schmidt noted decreased range of motion in the neck, specifically with extension of the cervical spine. (R. 452-53.) He observed increased pain with extension compared with flexion, and palpatory pain along the facet line in the cervical region in the midline. (R. 453.) Lewis also experienced increased pain with rotation of the neck and some palpatory pain into the right and left trapezius muscles and up into the occipital of the head. (*Id.*) However, Dr. Schmidt noted a normal gait and stance, and a full range of motion of the spine. (*Id.*)

Dr. Schmidt assessed neuralgia/neuritis and commented that Lewis' numbness, tingling, and painful sensation in his hands and forearms was related to carpal tunnel

syndrome. (R. 453-54.) He did not believe that Lewis' neck was playing a role in these symptoms, but instead believed that Lewis' headache and neck issues were independent and had been treated in the past without success. (R. 454.) He advised against steroid injections, and recommended that Lewis wear extension braces on his hands. (*Id.*) If Lewis was unable to get long-term relief with the braces, Dr. Schmidt recommended he see a hand surgeon for carpal tunnel release. (*Id.*)

On August 10, 2010, Lewis continued to complain to Dr. Wilkey of left arm pain and occasional numbness. (R. 463.) The steroid injection provided relief for about a week, after which symptoms returned. (*Id.*) Dr. Wilkey assessed cervical stenosis at C5-6 and C6-7 with left arm radiculopathy. (*Id.*) He recommended another steroid injection, but if that did not provide relief, he would recommend a two-level decompression and fusion. (*Id.*)

### 2. Physical Therapy

On April 29, 2010, Lewis was seen for his initial evaluation at SSM Physical Therapy at the referral of Dr. Williams. (R. 480-82.) His chief complaint was continued pain at a level eight out of ten, worse at his tailbone and at S1 bilaterally, but with no continued radicular pain. (R. 480.) He reported pain when standing longer than ten minutes, showering and shaving, cooking, laundry, and grocery shopping. (*Id.*) The therapist recommended skilled therapy to reduce pain, and increase mobility and flexibility in the thoracolumbar spine. (R. 481.) Lewis was provided a home exercise program and instructed to attend therapy for three times a week for the next three weeks. (*Id.*)

By May 18, 2010, Lewis had been to seven sessions, but continued to complain of pain and tightness in his hips and back during exercising, while standing, and bending forward.  (R. 479.)  He did, however, report a ten to fifteen percent improvement in pain and less pain with driving.  (*Id.*)  Lewis tolerated treatment well, with less complaints and improved mobility.  (*Id.*)  He progressed with range of motion, flexibility and stabilization strengthening, but continued to need core strengthening to improve his ability to perform daily tasks.  (*Id.*)

On May 25, 2010, Lewis reported that his back was feeling better and he was having less pain.  (R. 476.)  He did more activity over the weekend, but his back was sore as a result.  (*Id.*)  He tolerated treatment well without complaints of pain and showed improvement in mobility, flexibility, and strength.  (R. 477.)  A few days later, he had soreness in his lower back, but his legs were getting stronger and he was "overall feeling better."  (R. 473.)  The therapist instructed Lewis to start an independent exercise program.  (R. 475.)  On July 23, 2010, Lewis reported a twenty-five percent improvement in pain and was doing well on his independent exercise program.  (R. 470.)  Ultimately, Lewis was discharged from therapy on August 19, 2010 after he didn't return.  (R. 468.)

### 3. Treating Physicians for Mental Health

Records reveal that Lewis was seen by psychologist Dr. Amy Frankel from June of 2009 until June of 2010.  (R. 626-45.)  On June 16, 2009, Lewis self-referred himself due to a depressive state.  (R. 626.)  Lewis reported that recent stressors included his back injury and surgery, his recent move, marriage, and job loss.  (*Id.*)  His affect was

appropriate and his insight and judgment good.  (*Id.*)  Dr. Frankel assessed major depressive disorder, of moderate intensity, and recommended a medical evaluation. (*Id.*)  On June 23, 2009, Lewis returned and reported not being able to follow through on things such as "self-care, art, church, etc. despite [a] desire to do so."  (R. 627.)  Dr. Frankel recommended a change to his medication regime, which included Celexa, Depakote, and Cymbalta.  (*Id.*)  Lewis returned on July 7, 2009, again complaining of a lack of motivation and memory problems.  (R. 628.)  He was having difficulty following his AA program, but remained sober.  (*Id.*)  On July 23, 2009, Lewis was frustrated by chronic pain and complained that his medications made him tired and lethargic.  (R. 630.)  Lewis was "doing better" on July 30, 2009,  but expressed continued problems with pain and low energy.  (R. 631.)

On August 3, 2009, Dr. Frankel submitted a Medical Assessment of Ability to do Work-Related Activities evaluation for Lewis' prior disability claim.  (R. 648-49.)  Dr. Frankel opined that Lewis' ability to follow work rules, use judgment and interact with supervisors was good; his ability to relate to co-workers, deal with the public and function independently was fair; and that his ability to deal with work stresses and maintain attention or concentration was poor.  (R. 648.)  She commented that Lewis' depressive symptoms limit his concentration and memory and his chronic pain leads to frustration and irritability, as well as impatience with others.  (*Id.*)  She also noted he feels overwhelmed very easily and has difficulty coping effectively with stress.  (*Id.*)

Dr. Frankel further determined that although Lewis had a fair ability to understand, remember, and carry out simple instructions, his ability to do the same with

complex or detailed instructions was poor due to his impaired concentration and memory. (R. 649). Lastly, Dr. Frankel determined that Lewis could maintain personal appearance and maintained a fair ability to behave in an emotionally stable manner, relate predictability in social situations, and demonstrate reliability. (*Id.*) She noted that Lewis is impatient and irritable with others at times, and socially withdrawn and isolative at times. (*Id.*) Overall, Dr. Frankel opined that Lewis would be able to manage his own benefits in his best interest. (*Id.*)

Lewis returned to see Dr. Frankel on September 3, 2009. (R. 632.) He continued to have difficulty sustaining motivation and "easily gives up." (*Id.*) On September 17, 2009, Lewis reported that he continued to struggle with his back pain. (R. 633.) On October 22, 2009, he reported being frustrated and feeling "more hopeless and helpless," regarding progress in any area. (R. 635.) Dr. Frankel recommended psychiatric follow-up. (*Id.*) As of October 29, 2009, pain was interfering with Lewis' daily functioning. (*Id.*)

Lewis returned on November 11, 2009, and reported feeling hurt and angry regarding his marriage. (R. 636.) On his next visit, November 24, 2009, Dr. Frankel noted an increased effort to set realistic goals and complete them daily. (*Id.*) Dr. Frankel recommended a plan to continue reinforcing efforts toward goal achievement. (*Id.*) On December 17, 2009, Lewis was focused on ways to keep stress at a minimum during the holidays. (R. 637.) Dr. Frankel reviewed stress management and realistic coping skills. (*Id.*)

Lewis next returned on January 12, 2010.  (R. 638.)  He reported feeling anxious and worried about his wife's upcoming surgery.  (*Id.*)  Lewis was working on getting a new psychiatrist to manage his needs.  (R. 639.)  Lewis was next seen on February 26, 2010, and he reported being frustrated regarding lack of motivation, and continued conflict with his wife.   (R. 640.)

Lewis was not seen again until April 12, 2010.  (R. 641.)  He complained of an increase in memory and concentration problems.  (*Id.*)  Dr. Frankel discussed techniques for compensating for such problems.  (*Id.*)  On March 3, 2010, Lewis reported efforts to renew his "spiritual side."  (R. 642.)  At his next visit, he reported financial stress and continued tension with his wife.  (R. 643.)

On June 14, 2010, Lewis returned and reported feeling hopeful regarding his new AA group he would be leading.  (R. 644.)  On June 28, 2010, Lewis reported variable mood and energy level.  (R. 645.)  He was frustrated by the pattern of forward progress followed by "setbacks."  (*Id.*)  Throughout all sessions, Lewis exhibited fair to good insight and judgment, appropriate or blunted affect, and reported no suicidal ideation or hallucinations.  (R. 626-45.)

On June 9, 2010, Lewis saw Dr. Arturo Taca.  (R. 461.)  The record from that date reveals this was a follow-up visit from previous treatment.  (*Id.*)  Lewis reported that his mood was "ok," but that he was upset because he got denied disability and was worried about finances.  (*Id.*)  Upon mental status exam, he was well dressed, well groomed, cooperative and friendly, with no suicidal or homicidal intent, paranoia, delusions, or obsessions.  (*Id.*)  His affect was constricted, and his insight and judgment

were described as fair to good.  (*Id.*)  Dr. Taca assessed diagnoses as alcohol dependence, in remission, bipolar affective disorder, depressed, unspecified degree, and ADHD.  (*Id.*)  Dr. Taca provided brief psychotherapy and recommended Lewis continue with his current medications, which included Depakote, Adderall, Lunesta, Seroquel, and Abilify.  (*Id.*)

Lewis returned on July 8, 2010, and reported that he was still depressed, and could not sleep at night or focus.  (R. 460.)  He had been trying to go to vocational rehab and obtain his GED, but had been unsuccessful.  (*Id.*)  Lewis also reported that he attended a national AA convention in San Antonio, which he enjoyed.  (*Id.*)  A mental status exam revealed similar results as the previous visit.  (*Id.*)  Dr. Taca prescribed Lewis with Concerta and discontinued his Adderall prescription.  (*Id.*)  Dr. Taca increased the Abilify and Seroquel dosages and advised Lewis continue seeing his therapist.  (*Id.*)

On August 3, 2010, Lewis returned to see Dr. Taca.  (R. 458.)  Lewis reported that the Concerta had been helpful and that "he feels more organized, does laundry, feels active, and got his chauffer's license."  (*Id.*)  Dr. Taca recommended that Lewis continue with all current medications.  (*Id.*)

On January 30, 2012, Lewis was referred to Madden Mental Health Center after he reported in the ER that he was depressed and planned to commit suicide by overdosing on his roommate's medications.  (R. 612.)  Upon evaluation at Madden, Lewis reported that he had only claimed he was suicidal because a friend told him that was a good way to get his medications.  (R. 593.)  He denied depressive or suicidal

ideations and had a normal affect; his judgment was intact and his thoughts organized and goal directed.  (R. 593-96.)  He reported he completed activities of daily living by himself or with minimal assistance.  (R. 597.)  Lewis was discharged and advised to get set up with a clinic to obtain his medications.  (R. 599.)

### 4.    Agency Consultants

On October 12, 2010, Carol A. Seiler, a Single Decisionmaker (the "SDM"), completed a physical Residual Functional Capacity ("RFC") assessment.  (R. 102-07.) According to the SDM, Lewis could lift and/or carry twenty pounds occasionally and ten pounds frequently; stand and/or walk for six hours in an eight hour day; sit for six hours in an eight hour day; and had an unlimited ability to push and pull.  (R. 103.)  She based this assessment on Lewis' history of lumbar fusion surgeries, complaints of pain, treatment notes, and alleged daily activities, among other things.  (R. 103-04.)  She further determined that Lewis could frequently climb ramps, stairs, ladders, ropes, and scaffolds; could frequently balance, kneel, crouch, and crawl; but could only occasionally stoop due to his history of lumbar fusion.  (R. 104.)  She found no other manipulative, visual, communicative, or environmental limitations.  (R. 104-05.)  At the time of this assessment, there was no treating or examining source statements available.  (R. 106.)  The SDM concluded that Lewis maintained the ability to perform light work, such as mail clerk, picking table worker, and base filler.  (R. 108.)

Also on October 12, 2010, Dr. James Morgan completed a psychiatric review technique form and mental RFC assessment.  (R. 484-98.)  Dr. Morgan indicated that Lewis suffers from the following disorders: attention deficit hyperactive disorder, major

depressive disorder, bipolar disorder, and alcohol dependence. (R. 485-91.) According to Dr. Morgan, Lewis exhibited mild limitations in activities of daily living, and maintaining social functioning, and moderate limitations in maintaining concentration, persistence, and pace. (R. 492.) He saw no repeated episodes of decompensation. (*Id.*)

More specifically, in his mental RFC assessment, Dr. Morgan concluded that Lewis was moderately limited in his ability to understand, remember, or carry out detailed instructions; to maintain attention and concentration for extended periods; to perform activities within a schedule, maintain regular attendance, and be punctual; to sustain an ordinary routine without special supervision; to work in coordination or proximity to others without being distracted; to complete a normal work day and work week without interruptions; and to perform at a consistent pace without an unreasonable number of rest periods. (R. 496-97.) He found no other significant limitations in any other categories. (*Id.*)

Dr. Morgan based his conclusions on Lewis' occasional complaints of depression, anxiety, and frustration regarding lack of motivation. (R. 494.) Dr. Morgan noted that new medications in August 2010 proved helpful and that Lewis reported feeling more organized and active. (*Id.*) Dr. Morgan cited to records describing Lewis as cooperative, friendly, and in a "pretty good" mood. (*Id.*) Dr. Morgan also recognized that during numerous exams for physical impairments, Lewis had no complaints of symptoms related to mental impairments. (*Id.*) As for Lewis' daily activities, Dr. Morgan noted that despite his complaints of limitations, Lewis was able to cook full meals, drive,

shop, and go to church.  (*Id.*)  Dr. Morgan concluded that the record did not fully support Lewis' allegations and found them only partially credible.  (*Id.*)  According to Dr. Morgan, Lewis could perform simple, repetitive tasks.  (*Id.*)

### C.   Claimant's Testimony

Lewis appeared with counsel at the hearing before the ALJ.  At the time of the hearing, Lewis was 54 years old, 5'9" tall, and weighed 240 pounds.  (R. 53.)  He had completed about eleven years of education.  (R. 54.)  Lewis is separated from his wife and lives with a friend in a one-bedroom condominium.  (R. 52-53.)

Lewis alleges disability beginning on June 27, 2007.  (R. 55.)  Prior to his alleged disability, Lewis held a job as a truck driver and as a car salesman.  (R. 59, 81.)  Lewis testified that he injured his back in 2005 unloading his truck, which resulted in the first surgery by Dr. Sweeney.  (R. 61.)  In April 2007, he had his second surgery with Dr. Nolden.  (*Id.*)  He explained that Dr. Nolden replaced everything that Dr. Sweeny did originally, specifically replacing the three-level fusion with a four-level fusion.  (R. 61-62.)  After the second surgery, Lewis underwent the FCE for his worker's compensation carrier, which he said he performed fairly well on.  (R. 62.)  But Lewis testified that after the FCE he was in pain for approximately two to three days.  (*Id.*)  Dr. Nolden eventually released Lewis to go back to light work, at which time he tried working as a caregiver.  (R. 62-63.)

From June of 2008 to October 2008 Lewis worked as a caregiver.  (R. 56.)  As a caregiver, he had a flexible schedule working approximately four to six hours a day.  (R. 57.)  His duties included grocery shopping with patients, assisting patients in getting in

and out of bed, bathing patients, doing household chores, and preparing meals.  (R. 57, 78.)  Lewis was let go from this job due to a patient confidentiality issue.  (R. 58-59.)  Lewis worked as a caregiver for another company for a few months in 2009.  (R. 57.)  He was let go from that job because the company did not have any clients for Lewis to work with in light of his back restrictions.  (R. 59.)  Lewis also worked as a courier for two months in 2010, but discontinued that job due to the amount of walking required.  (R. 60, 209.)  About two months prior to the hearing, Lewis started working as a pizza deliveryman on an as-needed basis.  (R. 55.)  Lewis explained that the restaurant calls him on busy days, and if his back feels okay he goes to work.  (*Id.*)

Lewis explained that he was initially feeling better after Dr. Nolden's surgery, but when that changed, he began seeing Dr. Wilkey.  (R. 63.)  Dr. Wilkey recommended physical therapy, and Lewis also received epidural injections.  (R. 63-64.)  Dr. Wilkey also performed an MRI, which revealed that Lewis had a bulged disc above his fusion.  (R. 64-65.)  Lewis testified that Dr. Wilkey gave him a limitation of lifting up to ten pounds, and determined that he couldn't stand for over fifteen to twenty minutes without needing to sit down for twenty to thirty minutes.  (R. 65.)  Dr. Wilkey also recommended that Lewis be able to change positions frequently.  (*Id.*)  Dr. Wilkey advised that Lewis would need periods of laying down during the day.  (R. 67.)

Lewis has been diagnosed with cervical spondylosis, but testified that does not bother him as much as his lower back pain.  (R. 71.)  He suffers from very sharp pains in his back all day, and rated his pain at a seven or eight on a ten-point scale.  (R. 72.)  He claims that walking and climbing stairs aggravates his pain.  (R. 72-73.)  He gets

some relief when he lies down, but does not sleep well at night. (R. 72.) Lewis does not take any medication for the pain because he cannot afford the prescription medicines. (R. 73.) He does take over the counter medicine for his migraine headaches at least three times a day. (R. 73-74.) He explained that he only takes showers twice a week because it hurts to stand in the shower. (R. 75.) He also has to lean against the sink to shave. (*Id.*)

Lewis spends his days laying on the couch watching television, but has to get up and walk around occasionally before returning to the couch for twenty to thirty minutes. (R. 66.) Lewis prefers chairs that have a solid back and armrest because it takes the pressure off his back. (*Id.*) Lewis drives to get gas, buy cigarettes, and to go grocery shopping about twice a week. (R. 66, 76.) When he drives, he has to stop and walk around the car every twenty to twenty-five minutes. (R. 76.) While grocery shopping, he leans on the cart for support. (R. 76.) Lewis' roommate does the cooking and cleaning. (R. 76-77.)

Lewis testified that he saw a psychiatrist and a psychologist in St. Louis. (R. 64.) Lewis stopped seeing his psychiatrist at some point between 2008-2010 because he could no longer afford the treatment. (R. 71.) He did testify that he was taking Viibryd for his depression. (R. 67.) Lewis further testified that after he was removed from his wife's heath insurance, he went to Cook County hospital to get medications. (R. 70.) He told the hospital he was suicidal because his AA sponsor told him that if he claimed to be suicidal the hospital would provide his medications. (*Id.*)

Lewis also suffers from diabetes, for which he takes NovoLog and insulin shots. (R. 68-69.)  He claimed that he tests his blood sugar every day, but hasn't tested it within the last couple months because he cannot afford to buy the test strips.  (R. 69.) He carries a bottle of glucose pills for when he breaks out in a sweat, or gets lightheaded and dizzy due to low blood sugar.  (R. 70-71.)

Lewis no longer had any proceeds from his worker's compensation claim and has no sources of income, other than monthly Link funds.  (R. 74-75.)  Lewis has a history of alcohol abuse.  He testified that he attends AA meetings twice a week, and has been sober for fifteen years.  (R. 78-79.)  He cannot go to certain AA meetings because they do not have chairs with back support.  (R. 79-80.)  Lewis explained that he gets along with the other individuals at the AA Meetings.  (R. 78.)

### D.    Vocational Expert's Testimony

Vocational Expert Pamela Tucker (the "VE") also testified at the hearing.  The ALJ first asked the VE to classify Lewis' past work within the fifteen years prior to December 31, 2011, his date last insured.  (R. 80.)  VE Tucker classified Lewis' work as a truck driver as medium and semi-skilled under the Dictionary of Occupational Titles ("DOT"), but heavy as Lewis performed it.  (R. 82.)  She classified his positions as a caregiver and a car salesman as light and semi-skilled under the DOT.  (*Id.*)

Next, the ALJ asked VE Tucker to consider the following hypothetical person: an individual who (1) could lift and/or carry up to ten pounds on occasion; (2) could stand and/or walk six hours in an eight-hour workday; (3) could sit six hours in an eight-hour workday; (4) could perform all the postural activities of work -- including all climbing,

balancing, stooping, crouching, kneeling, and crawling -- on an occasional basis; and (5) would be limited to simple, routine, and repetitive tasks but without a set production rate requirement within a regular work shift. (R. 82-83.) The ALJ asked the VE whether such an individual could perform Lewis' past work as he performed it or as generally performed. (R. 83.) VE Tucker testified that such an individual would not be able to do so because Lewis' work was either performed at a higher physical demand level or was semi-skilled, requiring more than simple, routine tasks. (R. 83.)

Next, the ALJ asked VE Tucker to assume that the same hypothetical person was closely approaching advanced age and had a high school education. (R. 83.) The ALJ asked the VE whether there were jobs in the regional or national economy that such an individual could perform. (*Id.*) VE Tucker testified that such an individual would be capable of performing work as a laundry aide (6,000 jobs in Illinois), a callout clerk (1,300 jobs in Illinois), and a labeler (4,200 jobs in Illinois.) All of those jobs are light and unskilled. (*Id.*)

The ALJ then asked VE Tucker to assume the same hypothetical person, but who (1) could lift and/or carry up to ten pounds on occasion; and (2) could sit an hour at a time and stand a half an hour at a time, changing positions as needed. (R. 84.) The ALJ asked the VE whether that would change her answers to the previous hypothetical. (R. 85.) VE Tucker testified it would eliminate the callout clerk and laundry aide positions, and reduce the numbers of jobs available for the labeler position to approximately 2,100. (*Id.*) But she further testified that such an individual would be

capable of performing work as a pressing machine operator (1,800 jobs) and a molding machine operator (1,100 jobs), both of which are light, semi-skilled positions. (*Id.*) Next, the ALJ asked VE Tucker to assume the same hypothetical person, but who (1) could sit an hour at a time; and (2) could stand and/or walk a half an hour at a time, changing positions as needed. (R. 85.) VE Tucker testified that such an individual would be capable of performing the same jobs as in the previous hypothetical. (*Id.*)

Lastly, the ALJ asked VE Tucker to assume the following hypothetical person: an individual who (1) could lift and/or carry up to ten pounds on occasion; (2) could sit for four hours in an eight-hour workday; (3) could stand and/or walk two hours; (4) who was limited to the same postural activities as above; and (5) could perform simple, routine, and repetitive tasks, without set production rate requirements. (R. 86.) The VE explained that this individual would be precluded from working because the individual would be limited to working six hours in a day. (*Id.*) VE Tucker testified all of the jobs cited in her testimony were consistent with the descriptions in the DOT, including the limitations on sitting or standing and change of positions. (*Id.*)

On cross examination, Claimant's attorney asked the VE whether the DOT provided for sit/stand positions. (R. 87.) The VE responded that the DOT does not specifically address sit/stand options, and that if a job requires a person to be standing or walking for more than two hours, it is classified as light. (R. 87-88.) The VE explained that the pressing machine operator and molding machine operator positions could be performed with a sit/stand option because an individual could perform work from a seated position for thirty minutes of every hour. (R. 89.) According to the VE,

some employers would allow individuals in such positions to use a stool to perform their duties.  (R. 90.)  The VE explained that not all employers provide stools, but that she reduced the number of positions available for the pressing machine operator (from 4,000 to 1,800) and molding machine operator (from 3,200 to 1,100) to those that provide sit/stand options "based on [her] experience in placing people in jobs."  (R. 90-91.)

When pressed by Claimant's counsel, the VE testified that although she has placed individuals in positions that provide a sit/stand option, she has only followed-up with those individuals for 60-90 days after placement to see if they were still working in those positions.  (R. 91.)  In the year leading up to the hearing, she had only placed one individual in a job that provided for a sit/stand option.  (*Id.*)

Claimant's counsel also asked whether the VE looked to any studies or data to determine how many employers would accommodate a sit/stand option or whether she was just "guessing."  (R. 92.)  Again, the VE responded that the numbers she provided were based on her experience in placing individuals and talking to employers, and that there were no published resources available for her to utilize.  (*Id.*)

When asked by Claimant's counsel whether any of the stools provided had lumbar support, the VE responded that she could not attest to what type of stool each employer would provide.  (R. 92-93.)  Claimant's counsel also asked how many jobs would be available if an employee needed a stool with lumbar support or armrest.  (R. 93-94.)  The VE responded that she could not provide an exact number, but that

employers typically provide employees reasonable accommodations as required by the Americans with Disabilities Act. (R. 94.)

Next, Claimant's counsel asked what jobs would be available for an individual who had to walk around for ten minutes out of every hour. (R. 94.) The VE responded that all of the jobs she previously mentioned would be eliminated. (*Id.*) She further testified that all jobs in the national economy would be eliminated for an individual who required a five to ten minute break every fifteen minutes due to depression and an inability to concentrate. (R. 95.) The previous jobs she testified to would also be eliminated for an individual who was unable to remember and carry out reasonably simple instructions on a continuous basis. (*Id.*) Lastly, Claimant's counsel asked whether an individual who got into fights or verbal disagreements on a regular basis would be able to work. (R. 96.) The VE responded that all jobs would be eliminated. (*Id.*)

## II.   LEGAL ANALYSIS

### A.   Standard of Review

This Court will affirm the ALJ's decision if it is supported by substantial evidence and free from legal error. 42 U.S.C. § 405(g); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002.) Substantial evidence is more than a scintilla of evidence; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995) (*quoting Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971).) We must consider the entire administrative record, but will not "re-weigh evidence, resolve

conflicts, decide questions of credibility, or substitute our own judgment for that of the Commissioner." *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003) (*citing Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).)  This Court will "conduct a critical review of the evidence" and will not let the Commissioner's decision stand "if it lacks evidentiary support or an adequate discussion of the issues." *Lopez*, 336 F.3d at 539 (*quoting Steele*, 290 F.3d at 940.)

In addition, while the ALJ "is not required to address every piece of evidence," he "must build an accurate and logical bridge from the evidence to his conclusion." *Clifford*, 227 F.3d at 872.  The ALJ must "sufficiently articulate her assessment of the evidence to assure us that the ALJ considered the important evidence… [and to enable] us to trace the path of the ALJ's reasoning. *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) (per curiam) (*quoting Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985).)

### B.    Analysis under the Social Security Act

In order to qualify for disability insurance benefits, a claimant must be "disabled" under the Act.  A person is disabled if "he or she has an inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A).  In determining whether a claimant is disabled, the ALJ must consider the following five-step inquiry: "(1) whether the claimant is currently employed, (2) whether the claimant has a severe impairment, (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling, (4) if the

claimant does not have a conclusively disabling impairment, whether he can perform past relevant work, and (5) whether the claimant is capable of performing any work in the national economy." *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001.) The claimant has the burden of establishing a disability at steps one through four. *Zurawski v. Halter*, 245 F.3d 881, 885-86 (7th Cir. 2001.) If the claimant reaches step five, the burden then shifts to the Commissioner to show that "the claimant is capable of performing work in the national economy." *Id.* at 886.

Here, before applying the five-step analysis, ALJ Hellman addressed Claimant's request to reopen his prior claim based on "new and material evidence." ALJ Hellman denied that request, stating that the previous ALJ had the benefit of various records, and even addressed more limiting opinions of Dr. Wilkey than the one cited to by Claimant as new and material. (R. 32.) The ALJ thus found no sufficient basis for reopening the prior claim. (R. 33.)

Moving on to his analysis, at step one, the ALJ found that, despite some minimal recent work, Claimant had not engaged in substantial gainful activity during the period from May 27, 2010 through Claimant's date last insured of December 31, 2011. (R. 35.) At step two, ALJ Hellman determined that Claimant had the following severe impairments: lumbar disc disease, status post lumbar spine surgeries; osteoarthritis; cervical disc disease with stenosis and radiculopathy; major depressive disorder; bipolar disorder; and alcohol dependence, in remission. (*Id.*) At step three, the ALJ found that the Claimant did not have an impairment or combination of impairments that meets or

medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 35-37.)

The ALJ went on to assess Claimant's RFC. The ALJ determined that Claimant could perform light work as defined in 20 C.F.R. 404.1567(b), except that he could only occasionally lift and/or carry up to ten pounds, could sit for an hour at a time, stand or walk for thirty minutes at a time, changing positions as needed, and could occasionally climb, balance, stoop, kneel, crouch, and crawl. (R. 37-40.) The ALJ further found that Claimant could perform simple, routine, and repetitive tasks, but without set production rate requirements. (*Id.*) Based on this RFC, the ALJ concluded at step four that Claimant was unable to perform past relevant work. (R. 40.) However, at step five, the ALJ found that considering Claimant's age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that the Claimant could perform, such as labeler, pressing machine operator, and molding machine operator. (R. 40-41.) As a result, the ALJ concluded that Claimant had not been under disability from May 27, 2010 through the date last insured of December 31, 2011.[2] (R. 41-42.)

Lewis now argues that the ALJ erred by (1) failing to reopen his prior claim; (2) improperly assessing his RFC; and (3) improperly relying on the testimony of the VE.

### C.     This Court Lacks Jurisdiction to Review the ALJ's Decision not to Reopen the Prior Claim.

---

[2] The ALJ appears to have misstated his conclusion when he wrote that Claimant had not been under a disability from May 27, *2009* through December 31, 2011. (R. 41-42.) The ALJ previously made clear that he was examining the Claimant's disability status beginning on May 27, 2010, when Claimant's prior claim was denied. (R. 32.)

Claimant first takes issue with ALJ Hellman's decision not to reopen his prior claim. As discussed above, Lewis' prior (and second) claim for benefits was filed on October 30, 2008, but denied by another ALJ on May 26, 2010. (R. 287-88.) Lewis filed a request for review, but, for whatever reason, withdrew that request. (*Id.*) Lewis then asked ALJ Hellman to reopen his prior claim, arguing that there was new and material evidence that was not available to the previous ALJ. (R. 287-92, 294-300.) Specifically, in his pre-hearing brief to ALJ Hellman, Claimant described the new and material evidence as all the evidence in the file "that is subsequent to May 26, 2010 and demonstrates that the Claimant has never recovered from his initial injury in 2005 despite a 3-level fusion surgery in 2005 and a 4-level fusion surgery in 2007." (R. 288.) However, Claimant went on to further describe the so-called "new and material evidence" as the January 5, 2010 opinion from Dr. Wilkey and records from January 2010 through July 2010 demonstrating that Claimant underwent multiple steroid injections, took heavy pain medications, and continued to complain of pain. (R. 289, 299-300.)

In declining to reopen the prior-claim, ALJ Hellman stated:

In support of reopening, counsel defers to Dr. Wilkey's assessment and argued that the ALJ did not have the benefit of the opinion. However, those records included the opinion as of that date, and the decision addressed another even more limiting opinion of Dr. Wilkey. Counsel made no request to hold the record open after the hearing, yet submitted a post hearing brief and 348 pages of medical evidence after the hearing. All of the evidence concerns the period previously adjudicated and counsel provided no explanation as to its relevance. I have considered counsel's request for reopening of his previous claim but find no sufficient basis for it.

(R. 32.)  Claimant now argues before this Court that the ALJ failed to make the proper threshold injury into whether the evidence he presented was sufficiently new and material to warrant reopening his prior claim.  But, as the Commissioner points out, what Claimant fails to recognize is that this Court lacks jurisdiction to review ALJ Hellman's decision not to reopen his prior claim.

Generally, "when a claimant takes no action to review a decision of an ALJ, that decision becomes final and binding on the parties," and the doctrine of *res judicata* applies to that decision.  *Hussain v. Comm'r of Soc. Sec.*, No. 13-3691, 2014 WL 4230585, at *11 (S.D.N.Y. Aug. 27, 2014.)  As a result, when a claimant asks an ALJ to reopen a prior claim, where a final decision has previously been rendered, the ALJ may refuse that request under the doctrine of *res judicata*.  (*Id.*)  Thereafter, federal courts lack jurisdiction to review the ALJ's decision not to reopen a prior claim.  *Huffman v. Astrue*, No. 08-1336, 2010 WL 685897, at *33 (C.D. Ill. Feb. 19, 2010) (*citing Califano v. Sanders*, 430 U.S. 99, 107-08, 97 S. Ct. 980, 51 L. Ed. 2d 192 (1977)).  This is because a decision not to reopen a previous determination is not a final decision, and therefore is not within this Court's jurisdiction.  *McLachlan v. Astrue*, 703 F. Supp. 2d 791, 795 (N.D. Ill. 2010) (*citing Califano*, 430 U.S. at 107-09.)  This policy is designed to "prevent repetitive or belated litigation of state claims."  (*Id.*)

There are two exceptions to the general rule that courts lack jurisdiction to review an ALJ's decision not to reopen a prior claim.  The first exception is "in those rare instances where the Secretary's denial of a petition to reopen is challenged on constitutional grounds."  *McLachlan,* 703 F. Supp. 2d at 795 (quoting *Califano*, 430 U.S.

at 108.)  The second exception is where the ALJ has nevertheless "constructively reopened" the prior application.  *Id.*  A prior application is deemed to have been constructively reopened "if the Commissioner reviews the entire record and renders a decision on the merits."  *Malone v. Comm'r of Soc. Security*, No. 13-488, 2014 WL 2927293, at *2 (N.D.N.Y June 27, 2014); *see also Byam v. Barnhart*, 336 F.3d 172, 180 (2d Cir. 2003) ("[I]f the Commissioner reviews the entire record and renders a decision on the merits, the earlier decision will be deemed to have been reopened, and any claim of administrative *res judicata* [is] waived and thus, the claim is subject to judicial review.") (quotations omitted).

Here, Lewis has not raised any constitutional challenges, nor has he argued that ALJ Hellman constructively reopened the denial of his prior claim.  Instead, Lewis only argues that ALJ Hellman erred in not properly contemplating whether the evidence counsel highlighted was sufficiently new and material to warrant reopening.  Having failed to argue either exception to the general rule of jurisdiction described above, we conclude that we lack jurisdiction to review the ALJ's decision not to reopen Claimant's prior claim.

**D.     The ALJ's RFC Determination is Not Supported by Substantial Evidence.**

Claimant also argues that the ALJ failed to properly assess his RFC for a number of reasons, including his failure to properly assess the opinion of Dr. Wilkey, improperly relying on the opinion of the SDM, and failing to consider his obesity.  On this point, we agree.

The RFC is the most a claimant can still do despite his limitations.  20 C.F.R. §

404.1545(a)(1).  In making the RFC determination, the ALJ must decide which treating

and examining doctors' opinions should receive weight and explain the reasons for that

finding.  20 C.F.R. § 404.1527(d), (f).  The RFC assessment must contain a narrative

discussion describing how the evidence supports the ALJ's conclusions and explaining

why any medical source opinion was not adopted if the ALJ's RFC assessment conflicts

with such an opinion.  SSR 96-8p, 1996 WL 374184, at **5, 7; *accord Briscoe v.*

*Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005).  A court will uphold an ALJ's decision "if the

evidence supports the decision and the ALJ explains his analysis of the evidence with

enough detail and clarity to permit meaningful review."  *Arnett v. Astrue*, 676 F.3d 586,

591-92 (7th Cir. 2012) (*citing Eichstadt v. Astrue*, 534 F.3d 663, 665-66 (7th Cir. 2008)).

"Although an ALJ need not mention every snippet of evidence in the record, the ALJ

must connect the evidence to the conclusion; in so doing, he may not ignore entire lines

of contrary evidence."  *Id.* at 592.

Here, after reviewing the Claimant's testimony and recent medical history, the

ALJ acknowledged that Dr. Wilkey had not provided a medical opinion during the

relevant period (*i.e.,* after May 26, 2010).  He nonetheless looked to Dr. Wilkey's

January 2010 opinion, in which Claimant was limited to standing for no more than half

an hour and sitting for no more than one hour, with change in position as needed for

either.  (R. 39.)  Though the ALJ felt the "lack of objective findings in support of Dr.

Wilkey's opinion compromises its veracity," he strangely "accorded the opinion

significant weight" and adopted the change of position abilities in his RFC.  (R. 39-40.)

He did not look to Dr. Wilkey's previous opinion from 2009, in which Claimant was limited to sitting for four hours and standing for two hours in an eight hour day.[3]  (R. 646-47.)  The ALJ's decision to afford Dr. Wilkey's opinion significant weight, while simultaneously questioning its veracity (and ignoring other prior opinions from Dr. Wilkey) certainly raises a red flag.

The Court is left further confounded by the ALJ's reference to the opinion of the lay person SDM as that of the "State agency reviewing physician."  (R. 40.)  Specifically, the ALJ stated, "the State agency reviewing physician's opinion that the claimant could perform a wide range of light exertion work is supported by the objective findings."  (*Id.*) It is well settled that, as lay persons, SDMs cannot offer medical opinions.  *White v. Comm'r of Soc. Sec.*, No. 12-12833, 2013 WL 4414727, at *23 (E.D. Mich. Aug. 14, 2013) (*citing* 20 C.F.R. §§ 404.1513, 404.1527(a)(2)).  And, at least according to the Acting Chief Administrative Law Judge in 2010, they cannot even offer non-medical opinions as defined in Social Security Ruling 06-3p, see *Maynard v. Astrue*, No. 11-12221, 2012 WL 5471150, at *6 (E.D. Mich. Nov. 9, 2012).  Courts have reversed the decisions of ALJs who improperly rely on the opinion of an SDM or other lay person reviewers.  *See, e.g., Andreatta v. Astrue,* 11-3158, 2012 WL 1854749, at *10 (W.D. Mo. May 21, 2012) ("Because the ALJ's current reasoning relies on an impermissible source, substantial evidence does not currently exist for the RFC assessed by the ALJ and the Court thus remands for reconsideration of this issue."); *see also Dewey v. Astrue*, 509 F.3d 447, 449-50 (8th Cir. 2007).

---

[3] The VE testified that a person so limited would be precluded from working.  (R. 86.)

Here, given the ALJ's confusing treatment of Dr. Wilkey's opinion, we cannot agree with the Commissioner that his reliance on the opinion of the SDM was harmless error as was the case in *Jones v. Astrue*, No. 07-698, 2008 WL 1766964, at *25 (S.D. Ind. April 14, 2008). Instead, we are left wondering what evidence truly supported the ALJ's RFC assessment, and whether he improperly played doctor in making that assessment.

For these reasons, we remand this matter for a re-assessment of Claimant's RFC. We note that, standing alone, the ALJ's failure to address Claimant's obesity would likely amount to harmless error, especially where Claimant has not pointed to any other evidence suggesting that his obesity exacerbated his physical impairments or specified how his obesity further impaired his ability to work. *See Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004). Nonetheless, given our decision to remand, the ALJ should consider Claimant's obesity where appropriate.

Lastly, we comment only briefly on the ALJ's treatment of the VE testimony. As explained above, the VE testified that she reduced the numbers of jobs that would provide sit/stand options based solely on her experience in placing individuals. However, upon questioning by Claimant's counsel, she admitted to placing only one individual in a position with a sit/stand option in the recent past, and to generally following-up with individuals for only 60-90 days after placement. In his decision, the ALJ found the VE's opinion "well-supported," stating nothing more than that her reduction in numbers was "based on her experience with employers offering sit/stand options." (R. 41.)

Where, as here, the Claimant calls into question the testimony of the VE, the ALJ should make an inquiry as to whether the purported expert's conclusions are reliable. *Overman v. Astrue*, 546 F.3d 456, 465 (7th Cir. 2008) (quotation omitted).  In light of the VE's testimony that seemed to imply minimal experience in the area of sit/stand positions, the Court questions the ALJ's inquiry into her reliability and seriously doubts that her testimony about available jobs was in fact supported by substantial evidence. *See Britton v. Astrue*, 521 F.3d 799, 803 (7th Cir 2008) ("A finding based on unreliable VE testimony is equivalent to a finding that is not supported by substantial evidence and must be vacated.").  On remand, the ALJ should take care in assessing the reliability of any testimony from the VE.

**III.    CONCLUSION**

For the reasons set forth above, Claimant's motion for summary judgment is granted and the Commissioner's motion for summary judgment is denied.  This case is remanded to the Social Security Administration for further proceedings consistent with this Opinion.  It is so ordered.


**ENTERED:**

_____
**Michael T. Mason
United States Magistrate Judge**


**Dated: August 25, 2015**